## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD W. KRAMER,

                Plaintiff,

      v.

KILOLO KIJAKAZI[1],

              Defendant.

CIVIL ACTION NO. 3:21-CV-01078

(MEHALCHICK, MJ)

### MEMORANDUM

Plaintiff Edward W. Kramer brings this action under sections 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (incorporating § 405(g) by reference), seeking judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. (Doc. 1). The matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 11).

For the reasons set forth below, and upon detailed consideration of the arguments raised by the parties in their respective briefs, it is hereby ordered that the Commissioner's

---

[1] The Court has amended the caption to replace, as the named defendant, Social Security Commissioner Andrew M. Saul, with his successor, Social Security Commissioner Kilolo Kijakazi. See Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

decision to deny Kramer benefits is **AFFIRMED**, **FINAL JUDGMENT** is entered in favor of the Commissioner, and the Clerk of Court is directed to **CLOSE** this case.

I.   **BACKGROUND AND PROCEDURAL HISTORY**

On March 31, 2014, Kramer protectively filed applications under Title II and Title XVI of the Social Security Act, claiming disability beginning April 28, 2008. (Doc. 13-2, at 19; Doc. 13-3, at 23). The Social Security Administration initially denied the applications on September 18, 2014, prompting Kramer's request for a hearing, which Administrative Law Judge Daniel Balutis, held on June 23, 2016, and December 8, 2016. (Doc. 13-2, at 19, 37, 130). At the hearing, Kramer amended his alleged onset date to October 15, 2013. (Doc. 13-2, at 140-41; Doc. 13-8, at 6; Doc. 23, at 3).  In a December 20, 2016, written decision, the ALJ determined that Kramer is not disabled and therefore not entitled to benefits or income under Title II or Title XVI. (Doc. 13-2, at 31). On December 11, 2017, the Appeals Council subsequently denied Kramer's request for review. (Doc. 13-2, at 2). Kramer appealed the ALJ's decision to this Court and raised a challenge under the Appointments Clause of the Constitution. (Doc. 13-8, at 5; Doc. 13-9, at 45). While on appeal, Kramer filed a subsequent claim for Title XVI benefits on October 29, 2019. (Doc. 13-8, at 5; Doc. 13-9, at 76).

On June 1, 2020, the Court remanded the action to the Commissioner to conduct a new administrative hearing before a constitutionally appointed ALJ other than the ALJ who presided over Kramer's first hearing. (Doc. 13-9, at 45); *Kramer v. Berryhill*, No. 3:18-cv-00341 (M.D. Pa. June 1, 2020), ECF No. 30. On January 7, 2021, a second hearing was held by telephone due to the extraordinary circumstances presented by the COVID-19 pandemic in front of Administrative Law Judge Michele Stolls (the "ALJ"). (Doc. 13-8, at 5). The ALJ consolidated Kramer's March 31, 2014, Title II and Title XVI claims with his October 29,

2019, Title XVI claim and addressed all of Kramer's claims in her opinion. (Doc. 13-8, at 5). Kramer also confirmed at the January 7, 2021, hearing that Kramer had amended his alleged onset date to October 15, 2013, and understood the ramifications of this amendment. (Doc. 13-8, at 6, 51-52). In a March 12, 2021, written decision, the ALJ determined that Kramer is not disabled and therefore not entitled to benefits or income under Title II or Title XVI. (Doc. 13-8, at 27). As the appeals council did not assume jurisdiction of the case, the ALJ's March 12, 2021, decision after remand became the final decision. *See* 20 C.F.R. 404.984(a), (d) ("[W]hen a case is remanded by a Federal court for further consideration and the Appeals Council remands the case to an administrative law judge . . . the decision of the administrative law judge or administrative appeals judge will become the final decision of the Commissioner after remand on your case unless the Appeals Council assumes jurisdiction of the case.").

On June 18, 2021, Kramer commenced the instant action. (Doc. 1). The Commissioner responded on September 16, 2021, providing the requisite transcripts from Kramer's disability proceedings. (Doc. 12; Doc. 13). The parties then filed their respective briefs, with Kramer raising three principal bases for reversal or remand. (Doc. 19; Doc. 23; Doc. 26).

## II. STANDARD OF REVIEW

To receive benefits under Titles II or XVI of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1509, 416.909. To satisfy this requirement, a claimant must have a severe physical or mental impairment that

makes it impossible to do his or her previous work or any other substantial gainful activity that exists in significant numbers in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1505(a), 416.905(a).[2] Additionally, to be eligible under Title II, a claimant must have been insured for disability insurance benefits. 42 U.S.C. § 423(a)(1)(a); 20 C.F.R. § 404.131.

A. ADMINISTRATIVE REVIEW

In evaluating whether a claimant is disabled as defined in the Social Security Act, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do past relevant work, considering his or her residual functional capacity (RFC); and (5) whether the claimant is able to do any other work that exists in significant numbers in the national economy, considering his or her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a), 416.920(a). The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him or her from doing past relevant work. 20 C.F.R. §§ 404.1512(a), 416.912(a). Once the claimant has established at step four that he or she cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in

---

[2] A "physical or mental impairment" is defined as an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

the national economy that the claimant could perform that are consistent with his or her RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1).

   B. JUDICIAL REVIEW

   The Court's review of the Commissioner's final decision denying a claimant's application for benefits is limited to determining whether the findings of the final decisionmaker are supported by substantial evidence in the record. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations omitted). The quantum of proof is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial if the ALJ ignores countervailing evidence or fails to resolve a conflict created by such evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

   The question before the Court, therefore, is not whether Kramer was disabled, but whether the Commissioner's determination that Kramer was not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial

- 5 -

evidence."); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). If "the ALJ's findings of fact . . . are supported by substantial evidence in the record," the Court is bound by those findings. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

III.   **THE ALJ'S DECISION**

In a decision dated March 12, 2021, the ALJ determined that Kramer "has not been under a disability, as defined in the Social Security Act, from October 15, 2013, through the date of this decision." (Doc. 13-8, at 27). The ALJ reached this conclusion after proceeding through the five-step sequential analysis provided in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a).

A.   STEP ONE

At step one, an ALJ must determine whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If a claimant is engaging in SGA, the claimant is not disabled, regardless of age, education, or work experience. 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is defined as work activity requiring significant physical or mental activity and resulting in pay or profit. 20 C.F.R. §§ 404.1572, 416.972. The ALJ must consider only the earnings of the claimant. 20 C.F.R. §§ 404.1574(a)(2), 416.974(a)(2). Here, the ALJ determined that "[Kramer] has not engaged in

[SGA] since October 15, 2013, the amended alleged onset date." (Doc. 13-8, at 13). Thus, the ALJ proceeded to step two.

B. STEP TWO

At step two, the ALJ must determine whether the claimant has a medically determinable impairment – or a combination of impairments – that is severe and meets the 12-month duration requirement. 20 C.F.R. §§ 404.1502(a)(4)(ii), 416.920(a)(4)(ii). If the ALJ determines that a claimant does not have an impairment or combination of impairments that significantly limits the claimant's "physical or mental ability to do basic work activities," the ALJ will find that the claimant does not have a severe impairment and is therefore not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). If, however, a claimant establishes a severe impairment or combination of impairments, the ALJ proceeds to consider step three. For the amended alleged onset date,  the ALJ found that Kramer had seven severe impairments from the alleged onset date: (1) lumbar degenerative disc disease and degenerative joint disease with radiculopathy, (2) right carpal tunnel syndrome and epicondylitis status post release surgery, (3) left carpal tunnel, (4) seronegative inflammatory arthritis, (5) inflammatory arthritis, (6) latent tuberculosis infect, and (7) obesity. (Doc. 13-8, at 8). Since January 1, 2014, the ALJ found that Kramer had eleven severe impairments since January 1, 2014, the day after the date last insured: (1) major depressive disorder, (2) dysthymic disorder, (3) bipolar disorder, (4) fibromyalgia, (5) insomnia, (6) polyarthropathy, (7) thoracic degenerative disc disease and degenerative joint disease, (8) cervical degenerative disc disease and osteoarthritis with radiculopathy, (9) mild left thumb base osteoarthritis, (10) right cubital tunnel syndrome with numbness and tingling of the right-hand status post cubital tunnel release and

- 7 -

decompression of the ulnar nerve at the elbow,  and (11) degenerative arthritis of the fifth DIP joint of the left hand. (Doc. 13-8, at 8-9).

The ALJ also noted that Kramer had the following non-severe impairments from the amended alleged onset date: chronic pain disorder, contact dermatitis, and depression. (Doc. 13-8, at 9). Further, the ALJ found that Kramer had the following non-severe impairments as of January 1, 2014: Lyme disease; pain in both knees; hyperlipidemia; tobacco user; pilonidal cyst; vitamin D deficiency; nausea; lower urinary tract symptoms; dysuria; skin lesion of the scalp; Barrett's esophagus with dysplasia; unintentional weight loss; left shoulder pain and impingement, and daily headaches. (Doc. 13-8, at 10).

C. STEP THREE

At step three, the ALJ must determine whether the severe impairment or combination of impairments meets or equals the medical equivalent of an impairment listed in the version of 20 C.F.R. § Pt. 404, Subpt. P, App. 1 that was in effect on the date of the ALJ's decision. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 404.1526, 416.920(a)(iii), 416.925, 416.926. The sections in this appendix are commonly referred to as "listings." If the ALJ determines that the claimant's impairment or impairments meet a listing, then the claimant is considered disabled, otherwise, the ALJ must proceed to and analyze the fourth step of the sequential analysis. 20 C.F.R. §§ 404.1520(d), 416.920(d). Here, the ALJ determined that, regardless of the time addressed, Kramer did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (Doc. 13-8, at 11). The ALJ considered the following listings: 1.02 – Major Dysfunction of a Joint; 1.04 – Disorders of the Spine; 11.14 – Peripheral Neuropathy; 14.09

- 8 -

– Inflammatory Arthritis; Social Security Ruling 12-2p – Fibromyalgia; and 12.04 –
Depressive, bipolar, and related disorders; (Doc. 13-8, at 10-14).

    D.   RESIDUAL FUNCTIONAL CAPACITY

      Between steps three and four, the ALJ determines the claimant's residual functional
capacity (RFC), crafted upon consideration of all the evidence presented. At this intermediate
step, the ALJ considers all the claimant's symptoms and "the extent to which [they] can
reasonably be accepted as consistent with the objective medical evidence and other evidence."
20 C.F.R. §§ 404.1529(a), 416.929(a). This involves a two-step inquiry according to which the
ALJ must (1) determine whether an underlying medically determinable medical impairment
or impairments could reasonably be expected to produce the claimant's symptoms; and, if so,
(2) evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to
determine the extent to which they limit the claimant's functional limitations. *See* 20 C.F.R.
§§ 404.1529(b)-(c), 416.929(b)-(c).

      After weighing Kramer's statements against other evidence in the record, the ALJ
found that Kramer's impairments could reasonably be expected to cause the alleged
symptoms, but that his statements about the intensity, persistence, and the limiting effects of
the symptoms were not accepted to the extent Kramer claims to be inhibited. (Doc. 13-8, at
17). The ALJ then went on to detail Kramer's medical records and treatment history. (Doc.
13-8, at 17-25). Considering all evidence in the record, the ALJ determined that from the
amended alleged onset date of October 15, 2013, to the date last insured Kramer had the RFC

        to perform light work as defined in 20 CFR 404.1567(b) with the following
        limitations. He is limited to occupations that require no more than occasional
        postural maneuvers, such as balancing, stooping, kneeling, crouching, or
        climbing on ramps and stairs, and must avoid occupations that require climbing
        on ladders, ropes, and scaffolds or crawling. Additionally, he is limited to

occupations that require no more than frequent fine fingering, gross handling, or pushing and pulling with the upper extremities to include the operation of hand levers. Further, he must avoid concentrated prolonged exposure to temperature extremes, vibration or, extreme dampness and humidity. Moreover, he is limited to occupations which do not require exposure to hazards such as dangerous machinery and unprotected heights

(Doc. 13-8, at 14-15).

Further, the ALJ found that since January 1, 2014, Kramer has the RFC to perform

light work as defined in 20 CFR 416.967(b) with the following limitations. He is limited to occupations that require no more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, or climbing on ramps and stairs, and must avoid occupations that require climbing on ladders, ropes, and scaffolds or crawling. Further, he is limited to occupations that require no more than occasional overhead reaching with the upper extremities to include overhead work. Also, he is limited to occupations that require no more than frequent fine fingering, gross handling, or pushing and pulling with the upper left non-dominant extremity to include the operation of hand levers. Additionally, he is limited to occupations that require no more than frequent fine fingering, or gross handling with the upper right dominant extremity, and limited to occupations that require no more than occasional pushing and pulling with the dominant right upper extremity, to include the operation of hand levers. Furthermore, he must avoid concentrated prolonged exposure to temperature extremes, vibration, or extreme dampness and humidity. Moreover, he is limited to occupations which do not require exposure to hazards such as dangerous machinery and unprotected heights. Lastly, he is limited to unskilled work activity as defined in the Dictionary of Occupational Titles that is low stress, defined as only.

(Doc. 13-8, at 15).

E. STEP FOUR

Step four requires the ALJ to determine whether the claimant had, during the relevant period, the RFC to perform the requirements of his or her past relevant work regardless of the claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Past relevant work is work that the claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to

- 10 -

learn how to do the work. 20 C.F.R. §§ 404.1560(b), 416.920(a)(4)(iv). The ALJ considers whether the claimant retains the capacity to perform the particular functional demands and job duties of the past relevant work, either as the claimant actually performed it or as ordinarily required by employers throughout the national economy. *Garibay v. Comm'r Of Soc. Sec.*, 336 F. App'x 152, 158 (3d Cir. 2009) (quoting SSR 82–6). "If the claimant can perform his past relevant work despite his limitations, he is not disabled." *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 202 (3d Cir. 2019) (citing 20 C.F.R. § 404.1520(a)(4)(iv)); *see also* 20 C.F.R. § 416.920(a)(4)(iv). Here, the ALJ noted that Kramer is unable to perform any past relevant work and proceeded to Step Five of the sequential analysis. (Doc. 13-8, at 25).

F.  STEP FIVE

At step five, the ALJ considers the claimant's age, education, and work experience to determine whether the claimant can make the adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). A claimant who can adjust to other work is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Here, considering Kramer's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Kramer can perform. (Doc. 13-8, at 25). In making this determination, the ALJ relied on the expertise of the vocational expert who testified that Kramer would be able to perform the requirements of representative occupations, such as Housekeeper/Cleaner, Sorter, and Cashier II with jobs ranging from 577,000 to 3,600,000 positions nationally.[3] (Doc. 13-8, at 26). Finally, the ALJ explained that "when the residual

---

[3] The ALJ noted that while Kramer is also limited to occupations that require no more than frequent feeling with the upper right dominant extremity as of January 1, 2014, the vocational expert testified that the same positions remain available within the national economy with no erosion. (Doc. 13-8, at 26).

functional capacity since January 1, 2014, is reduced to sedentary, with the limitation of no more than frequent feeling with upper right dominant extremity, the vocational expert testified that there are jobs available within the national economy" such as order clerk, addresser, and lens inserter with positions ranging from 47,000 to 222,000 nationally. (Doc. 13-8, at 27).

Given the foregoing analysis, the ALJ determined that Kramer was not disabled and denied his applications for benefits. (Doc. 13-8, at 27).

IV.  **DISCUSSION**

On appeal, Kramer advances three arguments. (Doc. 19, at 1). First, Kramer asserts that "[t]he Commissioner under whom the ALJ issued the final decision serves a longer term than the President and is removable only for cause, in violation of the separation of powers; therefore, the decision is constitutionally defective and should be reversed." (Doc. 19, at 5). Second, Kramer argues that the ALJ erroneously rejected the opinion of his treating certified physician assistant Debra Goodwin ("PA-C Goodwin"). (Doc. 19, at 6). Finally, Kramer contends that the ALJ erred in evaluating his mental limitations. (Doc. 19, at 12-16). In response, the Commissioner maintains that the ALJ's decision is supported by substantial evidence and should be affirmed. (Doc. 23, at 2).

For the reasons set forth below, the Commissioner's decision to deny Kramer benefits will be **AFFIRMED** and **FINAL JUDGMENT** shall be entered in favor of the Commissioner.

A.  THE ALJ'S DECISION IS NOT PROCEDURALLY DEFECTIVE.

Kramer avers that the ALJ's decision is constitutionally defective and should be reversed by the Court because the ALJ's delegation of authority to hear and decide Kramer's

claim came from Commissioner Saul. (Doc. 19, at 6). Further, Kramer argues that "a presumably improper legal standard was utilized to adjudicate this disability claim at the administrative level" because the ALJ "decided this case under regulations promulgated by [Commissioner] Saul when he had no constitutional authority to issue those rules." (Doc. 19, at 6). In opposition, the Commissioner asserts that Kramer fails to show that any separation of powers violation actually caused him harm. (Doc. 23, at 6-7). The Commissioner further argues that "the ALJ had her appointment ratified by an Acting Commissioner of Social Security – whom the President could have removed from that role at will, at any time. Thus the removal restriction had no impact on the ALJ's appointment." (Doc. 23, at 6).

In support of his argument, Kramer relies on the Supreme Court's decisions in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), and *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020). (Doc. 19, at 5). In *Seila Law*, the Supreme Court held the Consumer Financial Protection Bureau's ("CFPB") removal structure, which allowed for the CFPB director to be removed by the President only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers by insulating the director from removal by the President. *Seila Law*, 140 S. Ct. at 2197. The following year, in *Collins*, the Court held a provision limiting the President to remove the director of the Federal Housing Finance Agency ("FHFA") only for cause violated the separation of powers. 141 S. Ct. 1761, 1783 (2021) (holding that "*Seila Law* is all but dispositive").

Applying the holdings in *Seila Law* and *Collins* here makes it clear that the provision for removal of the Commissioner of Social Security, 42 U.S.C. § 902(a)(3), violates the separation of powers. *See Seila Law*, 140 S. Ct. at 2197; *Collins*, 141 S. Ct. at 1783. The Commissioner, a single officer at the head of an administrative agency, is removable only for

cause. *See* 42 U.S.C. § 902(a)(3). This statutory clause suffers from the same defect as the removal provisions at issue in *Seila Law* and *Collins*, and thus violates the separation of powers. *See Seila Law*, 140 S. Ct. at 2197; *Collins*, 141 S. Ct. at 1783; *see also* Office of Legal Counsel, *Constitutionality of the Comm'r of Soc. Sec.'s Tenure Protection*, 2021 WL 2981542, at *7 (July 8, 2021).

Here, Kramer argues that he was deprived of a valid administrative adjudicatory process because, under 42 U.S.C. § 405(b)(1), only the Commissioner of Social Security can make findings of fact and issue final decisions as to benefits eligibility. (Doc. 19, at 6). Specifically, Kramer argues that:

> The ALJ's delegation of authority to hear and decide [Kramer]'s claim came from Commissioner Saul and is therefore constitutionally defective. Similarly, the ALJ decided this case under regulations promulgated by [Commissioner] Saul when he had no constitutional authority to issue those rules. Accordingly, a presumptively improper legal standard was utilized to adjudicate this disability claim at the administrative level.

(Doc. 19, at 6) (citations omitted).

In response, the Commissioner argues that Kramer's separation of powers argument fails because Kramer "cannot show the required nexus between Section 902(a)(3)'s removal restriction and the denial of his benefits claim." (Doc. 23, at 7). The Commissioner avers that Commissioner Berryhill "was removable at will, refuting any suggestion of a nexus between Section 902(a)(3)'s tenure protection for a confirmed Commissioner and the ALJ's appointment." (Doc. 23, at 12). Further, the Commissioner argues that Kramer "cannot show that the removal restrictions 'inflict[ed] compensable harm' of any sort on him." (Doc. 23, at 12) (quoting *Collins*, 141 S. Ct. at 1789) (alteration in original).

First, the removal provision does not render the Commissioner's appointment invalid and thus, does not automatically void the ALJ's actions under the Commissioner. In *Collins*, the Court found the defective removal procedure did not render the FHFA's actions void from the outset. 141 S. Ct. at 1787 ("Although the statute unconstitutionally limited the President's authority to remove the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA [challenged on appeal] as void."). The ALJ who denied Kramer's disability claim was not appointed by a Commissioner subject to Section 902(a)(3)'s removal restriction. (Doc. 23, at 14). Rather, the ALJ was appointed by an Acting Commissioner of Social Security whom the President could remove at any time. (Doc. 23, at 9-10). Because an Acting Commissioner does not have the same removal restriction as the Commissioner and because the ALJ was properly appointed, Kramer's argument is not persuasive in this case. *See Collins*, 141 S. Ct. at 1781 (because removal restrictions of the FHFA applied only to the Director, "any constitutional defect in the provision restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" by actions of an Acting Director who enjoyed no such protections); *see also Boger v. Kijakazi*, No. 1:20-CV-00331, 2021 WL 5023141, at *3 n.4 (W.D.N.C. Oct. 28, 2021) (finding that "Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because ALJ Howard was appointed by an Acting Commissioner of Social Security who could be removed from that office at the President's discretion.").[4]

---

[4] Other courts determining the issue of traceability for purposes of jurisdiction have disagreed with this position as it relates to the Social Security Administration. *See Dante v. Saul*, No. 20-CV-0702, 2021 WL 2936576, at *8 (D.N.M. July 13, 2021) (finding that "the plain language of § 902(a) suggests that the Presidential removal restrictions may apply not

Second, Kramer has not demonstrated that the unconstitutionality of 42 U.S.C. § 903(a)(3) inflicted compensable harm. *See Boger*, 2021 WL 5023141, at *3 (finding that the ALJ's decision was not constitutionally defective where "Plaintiff simply argues that all actions taken by the Commissioner – and in turn his appointed ALJ's – are void due to the unconstitutional removal provision[,]" but "offers no evidence to show that there is a nexus between the unconstitutional removal restriction and the denial of his application for disability benefits"); *see also Robinson v. Kijakazi*, No. 1:20-CV-00358, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27, 2021) (same); *Amanda B. v. Comm'r of Soc. Sec.*, No. 3:20-CV-00434, 2021 WL 4993944, at *9-10 (D. Or. Oct. 26, 2021) (concluding that "the authorities cited by Plaintiff in her supplemental briefing do not affect the disposition of this matter" where plaintiff "does not allege 'the [Social Security Administration] Commissioner took any action that is in any way related to the ALJ's decision' or the decision by the Appeals Council.").

In *Collins*, the Court found it was "possible for an unconstitutional provision to inflict compensable harm," and remanded to the lower court to determine whether the removal provision "inflicted harm." 141 S. Ct. at 1788-89. In that case, the action challenged by the plaintiffs was the directors' adoption and implementation of an amendment (the "Third Amendment") to certain financial agreements that "materially changed the nature of the agreements" and resulted in the companies in which plaintiffs were shareholders transferring to the U.S. Treasury "at least $124 billion dollars more than the companies would have had

---

only to a Senate-confirmed Commissioner, but also to any individual serving in the office of Commissioner, including an Acting Commissioner"), *but see Collins*, 141 S. Ct. at 1783 (noting that "we generally presume that the President holds the power to remove at will executive officers and that a statute must contain 'plain language to take [that power] away' " when discussing whether an acting director is a confirmed director) (quoting *Shurtleff v. U.S.*, 189 U.S. 311, 316 (1903)).

to pay" under the prior form of the agreements. *Collins*, 141 S. Ct. at 1774. The Third Amendment was not subject to full judicial review and the Supreme Court thus found that fact-finding by the lower courts was required in order to determine whether plaintiffs suffered harm directly as a result of the FHFA director's unconstitutional tenure protection. *Collins*, 141 S. Ct. at 1785, 1789. Relief is available in removal challenges only where officials subject to the challenged removal restrictions cause the alleged injuries, and where those restrictions themselves caused "compensable harm" to plaintiffs. *Collins*, 141 S. Ct. at 1789.

By contrast, in this case, the action challenged by Kramer is the ALJ's decision denying him benefits. (Doc. 13-8, at 27). Kramer has alleged no direct action by former Commissioner Andrew Saul and no involvement—or even awareness—by the former President in the ALJ's decision. *Cf. Collins*, 141 S. Ct. at 1802 (Kagan, J. concurring) ("[G]iven the majority's remedial analysis, I doubt the mass of [Social Security Administration] decisions—which would not concern the President at all—would need to be undone. When an agency decision would not capture a President's attention, his removal authority could not make a difference."). Kramer cannot show how the President's supposed inability to remove the Commissioner without cause might have affected any ALJ's disability benefits decision, much less the decision on his specific claim. As the Commissioner points out in her brief in opposition, holding Kramer to a lower bar would provide him an "unwarranted remedial windfall," in which "many thousands of other disappointed claimants could receive the same relief." (Doc. 23, at 17, 18). Further, Kramer has made no clear allegation that Commissioner Saul's unconstitutional tenure resulted in compensable harm to him. The ALJ's decision was based upon an uncontested factual record and the application of established law, including case law, which generally cannot be changed by the Commissioner. There is no allegation

suggesting a direct nexus between the adjudication of Kramer's disability claim by the ALJ and the alleged separation of powers violation in the removal statute that applies to the Commissioner. Kramer's allegations merely express general dissatisfaction with the outcome of the adjudication of his Title II and Title XVI disability claims.

Lastly, as the Commissioner notes, several constitutional remedial doctrines support the denial of Kramer's request for a rehearing. (Doc. 23, at 19). The Commissioner contends that the harmless error doctrine and other established remedial doctrines dictate that Kramer "is not entitled to relief unless and until he shows harmful error in the decision the ALJ issued on his claim." (Doc. 23, at 19). Here, because Kramer cannot show that the Commissioner's tenure protection affected the ALJ's decision on his claim, his request for rehearing on such grounds is denied. Next, "[t]he *de facto* doctrine springs from the fear of the chaos that would result from multiple and repetitious suits challenging every action taken by every official whose claim to office could be open to question, and seeks to protect the public by insuring the orderly functioning of the government despite technical defects in title to office." *Ryder v. United States*, 515 U.S. 177, 180 (1995). Here, however, the Commissioner's appointment and the appointment of the presiding ALJ were entirely proper. To hold otherwise would risk unwinding untold thousands of disability determinations, endangering the efficient and orderly adjudication of benefits by the Social Security Administration and harming the interests of those whose disability claims have yet to be adjudicated— precisely the type of "chaos" the *de facto* officer doctrine was designed to prevent. *Collins*, 141 S. Ct. at 1802 (Kagan, J., concurring).

Lastly, the rule of necessity states that a judge must exercise adjudicatory responsibility over a matter, notwithstanding some defect in his or her title or authority, where all other

judges share the same defect. *See Philadelphia v. Fox*, 64 Pa. 169, 185 (Pa. 1870). Here, it could not have been an error for the deciding ALJ to hear Kramer's disability claim. If the Commissioner's tenure protection somehow filters down to affect one ALJ within the entire Social Security Administration, it affects all such ALJs. To hold that the assigned ALJ should have declined to adjudicate Kramer's claim for that reason would have meant that all other ALJs must decline to adjudicate as well for the same reason. Such widespread action would have left Kramer without a forum to adjudicate his claims and it would have denied him even the opportunity to qualify for benefits.

Accordingly, Kramer has not alleged any connection between the unconstitutional limit on the Commissioner of Social Security's removal and the ALJ's decision denying Kramer's benefits. *See Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir. 2021) ("[T]here is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground."). Thus, while the removal clause in § 902(a)(3) violates the separation of powers, it does not independently require the Court to reverse the ALJ's decision absent a showing of compensable harm.

B.  THE ALJ DID NOT ERR IN HER EVALUATION OF PA-C GOODWIN'S OPINION.

Kramer argues that the ALJ erroneously rejected the opinion of his treating source, PA-C Goodwin. (Doc. 19, at 6). Kramer contends that PA-C Goodwin provided opinions on June 14, 2016, and November 23, 2020, and that the ALJ failed to properly consider the limitations opined therein. (Doc. 19, at 7-8). Kramer also takes issue with the ALJ's characterization of Kramer's daily activities and her recitation of the medical records, and argues that the ALJ impermissibly inserted her lay opinion for that of a medical practitioner.

(Doc. 19, at 8-11). The Commissioner responds that the ALJ's evaluation of PA-C Goodwin's opinion is sufficient as she is not an acceptable medical source under the previous regulations and that the ALJ adequately explained her reasoning in evaluating the opinion. (Doc. 23, at 26-29). Further, the Commissioner contends that the ALJ adequately discussed the medical evidence and medical expert opinions throughout her decision. (Doc. 23, at 29-31).

The ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations. *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). "[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.,* 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n. 1 (3d Cir. 1999)). "[O]nce the ALJ has made this [RFC] determination, [a court's] review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence." *Black v. Berryhill*, No. 16-1768, 2018 WL 4189661, at *3 (M.D. Pa. Apr. 13, 2018).

When determining a claimant's RFC, the ALJ must consider all the evidence of the record and, regardless of its source, "evaluate every medical opinion ... receive[d]." *Burnett*, 220 F.3d at 121 (internal citations omitted); *see* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also* SSR 96-8P, 1996 WL 374182, at *2 ("RFC is assessed by adjudicators at each level of the administrative review process based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements.'"). As this matter involves a claim filed before March 27, 2017, the previous regulatory framework governing the evaluation of medical opinions applies to the ALJ's evaluation of the medical opinions in the record. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c);

"A cardinal principal guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)); *see also Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987). However, a "treating source's opinion is not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record.'" *Scouten v. Comm'r Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (alteration in original (quoting 20 C.F.R. § 404.1527(c)(2)). Further, an ALJ may give an opinion less weight or no weight if it does not present relevant evidence or a sufficient explanation to support it, or if it is inconsistent with the record as a whole. 20 C.F.R. §§ 404.1527(c), 416.927(c). If a conflict exists in the evidence, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" *Plummer*, 186 F.3d at 429 (quoting *Mason*, 994 F.2d at 1066); *see also Morales*, 225 F.3d at 317.

It is the duty of the ALJ to explain the rationale for the weight afforded to each medical opinion, as this allows for meaningful judicial review. *Plummer*, 186 F.3d at 429 ("The ALJ must consider all the evidence and give some reason for discounting the evidence that [she] rejects." (quoting *Mason*, 994 F.2d at 1066)). The ALJ, however, should refrain from rejecting all medical opinions in favor of his or her own lay interpretation of the medical evidence. *Slotcavage v. Berryhill*, No. 18-1214, 2019 WL 2521634, at *1 (M.D. Pa. June 3, 2019).

The ALJ did not err in weighing the opinion of PA-C Goodwin. (Doc. 13-6, at 23). As mentioned *supra*, an ALJ may give an opinion less weight or no weight if it does not present relevant evidence or a sufficient explanation to support it, or if it is inconsistent with the record as a whole. 20 C.F.R. §§ 404.1527(c), 416.927(c). It is the duty of the ALJ, however, to

explain the rationale for the weight afforded to each medical opinion, as this allows for meaningful judicial review. *Plummer*, 186 F.3d at 429. Further, "under the old regulations, a physician assistant's opinion [is not] entitled to controlling weight, as a physician assistant [is] not considered an 'acceptable medical source.'" *Martinez v. Kijakazi*, No. 3:20-CV-01550, 2022 WL 1062984, at *6 (M.D. Pa. Apr. 8, 2022) (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (explaining requirements for a treating source's medical opinion to be assigned "controlling weight"); 20 C.F.R. §§ 404.1527(a)(1), 416.1527(a)(1) (limiting "medical opinions" to "statements from acceptable medical sources"); 20 C.F.R. §§ 404.1502(a), 416.902(a) (defining "acceptable medical source" to include licensed physician assistants only with respect to claims filed under the new regulations")).

Contrary to Kramer's assertions, substantial evidence supports the ALJ's consideration of PA-C Goodwin's opinion. (Doc. 13-8, at 23). On June 4, 2016, PA-C Goodwin opined that Kramer could lift and carry less than 10 pounds on both an occasional and frequent basis, could stand and walk with normal breaks and sit for less than two hours during an eight-hour day, and can sit for 45 minutes without needing to change positions. (Doc. 13-7, at 438). Further, PA-C Goodwin stated that Kramer would need to lie down every two to two and a half hours for 60 to 90 minutes during a work shift; could never twist, stoop, or climb ladders; and could occasionally crouch and climb stairs, noting that such actions were limited. (Doc. 13-7, at 439). PA-C Goodwin noted that Kramer's reaching, handling, feeling, pushing, and pulling were all affected by his impairments due to his back, neck, and shoulder pain, and his slightly decreased sensation in both hands. (Doc. 13-7, at 439). PA-C Goodwin contended that Kramer was to avoid all exposure to wetness and humidity, even moderate exposure to extreme heat, concentrated exposure to noise, and had no restrictions regarding extreme cold,

hazards such as machinery and heights, fumes, odors, dust, gases, poor ventilation, and the like. (Doc. 13-7, at 439). Finally, PA-C Goodwin concluded that Kramer would be absent from work more than three times a month. (Doc. 13-7, at 440).

Additionally, on November 17, 2020, PA-C Goodwin provided another opinion noting that Kramer's conditions had become worse since her June 14, 2016, opinion (Doc. 13-13, at 489). Dr. Goodwin opined that

> He continues to have lower back pain that at times radiates into his lower extremities and exacerbated by sitting, walking, lying down, all of this contributing to increased depression as both the pain and medications (oxycodone, robaxin, cymbalta, bupropion, doxepin, provigil, trazodone, and lurasidone) also contribute to the decrease in his activities, mood, relationships, sleep, walking and working ability. Chiropractic and physical therapy treatments have not made a significant improvement in his pain. Med Marijuana has not made much of an improvement. Additionally, he has begun to have neck and shoulder pain for which he has seen Orthopedist and received injections. We are scheduling additional imaging to more fully evaluate his worsening pain.

(Doc. 13-13, at 489).

Kramer asserts that the ALJ erroneously afforded PA-C Goodwin's opinions little weight. (Doc. 19, at 8). Specifically, Kramer argues that the ALJ failed to adequately address PA-C Goodwin's June 2014, opinion as it "is nearly identical to the rationale provided by the prior ALJ in December 2016." (Doc. 19, at 8). Further, Kramer posits that the ALJ failed to consider PA-C Goodwin's November 2020, opinion as she merely referenced the exhibit number and did not summarize or provide a reason for rejecting the opinion. (Doc. 19, at 8).

Contrary to Kramer's contentions, the Court finds substantial evidence to support the ALJ's consideration of PA-C Goodwin's opinion. As mentioned *supra*, in June 2016, PA-C Goodwin opined that Kramer required the opportunity to alternate sitting, standing, or walking every 45 minutes; would need to lie down during the work day; and would miss three

- 23 -

or more days of work a month. (Doc. 13-7, at 438-40). PA-C Goodwin further opined that Kramer could occasionally crouch and climb stairs, but could never twist, stoop, or climb ladders and had limitations in reaching, handling, feeling, pushing, and pulling. (Doc. 13-7, at 439). In November 2020, PA-C Goodwin opined that Kramer's condition had gotten worse. (Doc. 13-13, at 489). PA-C Goodwin stated that Kramer continues to have pain that is exacerbated by sitting, walking, and lying down which contributes to his increased depression and the decrease in his activities, mood, relationships, sleeping, walking, and working ability. (Doc. 13-13, at 489). Further, PA-C Goodwin outlined Kramer's treatment and medications. (Doc. 13-13, at 489).

The ALJ, however, accorded PA-C Goodwin's opinions "little" weight. (Doc. 13-8, at 23). The ALJ explained that while "under the prior rules, PA-C Goodwin is not an acceptable medical source, [the ALJ] considered all relevant opinions." (Doc. 13-8, at 23). The ALJ explained that PA-C Goodwin's " assessment is no[t] supported by or consistent with, the longitudinal record, including her own relatively benign longitudinal examination findings." (Doc. 13-8, at 23). Specifically, the ALJ noted that PA-C Goodwin's "records do not reflect longitudinal motor, gait, sensory, or reflect deficits and primarily contain [Kramer's] subjectively reported symptoms with no objective signs or findings to support such extreme limitations." (Doc. 13-7, at 160-176, 350-435, 512-521; Doc. 13-8, at 23). The ALJ noted diagnostic testing, including MRIs and x-rays, that do not support PA-C Goodwin's limitation findings and Kramer's daily activities. (Doc. 13-2, at 160-64; Doc. 13-6, at 18-20; Doc. 13-8, at 23, 53, 62-64, 71; Doc. 13-12, at 31-34, 41-43). The ALJ specifically noted Kramer's ability to perform daily activities from the alleged onset date to at least 2016 and his ability to perform daily activities throughout the relevant time period. (Doc. 13-2, at 138, 140,

155, 159-66; Doc. 13-6, at 18-22; Doc. 13-8, at 23, 61-63; Doc. 13-12, at 31-37). Thus, the ALJ's assignment of "little" weight to the opinion of PA-C Goodwin is supported by substantial evidence.

Additionally, the ALJ specifically cited PA-C Goodwin's November 2020, opinion when finding that her June 14, 2016, opinion deserved little weight. (Doc. 13-8, at 23; Doc. 13-13, at 489). PA-C Goodwin's November 2020, opinion was given to provide further insight regarding the changes in Kramer's condition since her June 14, 2016, opinion and did not provide specific functional limitations. (Doc. 13-13, at 489). As the ALJ stated that she considered the opinion PA-C Goodwin, cited the November 2020, and the ALJ's recitation of the opinion does not conflict with the November 2020, opinion the Court has no reason to believe that the November 2020, opinion was not considered. (Doc. 13-8, at 23; Doc. 13-13, at 489).

Finally, the ALJ's consideration of Kramer's daily activities and the medical record was not erroneous when assigning weight to PA-C Goodwin's opinions. (Doc. 13-8, at 23). The ALJ cited substantial evidence including Kramer's testimony from hearings in 2016 and 2020, functional reports from Kramer and his mother, and medical records spanning across the relevant time period.[5] (Doc. 13-2, at 160-64; Doc. 13-6, at 18-20; Doc. 13-8, at 23, 53, 62-64, 71; Doc. 13-12, at 31-34, 41-43). Additionally, the ALJ considered multiple medical opinions which supported her RFC findings. (Doc. 13-8, at 22-25). For example, the ALJ afforded great weight to the opinion of Dr. Wilson, who found that Kramer could perform

---

[5] Further, although not discussed when assessing PA-C Goodwin's opinion, the ALJ considered Kramer's use of medication throughout her opinion. (Doc. 13-7, at 31; Doc. 13-8, at 9-21, 60).

light work with postural limitations. (Doc. 13-8, at 22; Doc. 13-9, at 84-89). To reiterate, the Court is not now tasked with revisiting these factual issues but with determining whether the ALJ provided valid reasons for his evaluations and based his conclusions on substantial evidence. Because the ALJ provided adequate articulation and record support for according "little" weight to the opinion of PA-C Goodwin, Kramer's argument on this score is unavailing.

C.  THE ALJ REASONABLY CONSIDERED KRAMER'S MENTAL IMPAIRMENTS.

Kramer argues that the ALJ's evaluation that his depression was non-severe prior to his date last insure of December 31, 2013, was in error.[6] (Doc. 19, at 14). Additionally, Kramer contends that the ALJ failed to take his mental impairments into account when crafting his RFC since January 1, 2014, as the ALJ found that his depression was severe during this time period. (Doc. 19, at 14-15). The Commissioner argues that the ALJ did account for further limitations regarding Kramer's mental impairments upon finding that his depression was severe since January 1, 2014. (Doc. 23, at 32-33). Further, the Commissioner posits that any distinction between a finding of severe and non-severe did not affect the ALJ's disability findings as the ALJ found that for both periods Kramer could perform the same occupations rendering a finding of not disabled. (Doc. 23, at 33-43).

The regulations provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521. To establish the requisite level of limitation, a claimant

---

[6] In his brief in support, in some instances, Kramer states that his date last insured was December 31, 2014. (Doc. 19, at 14). However, upon review of the record, the Court finds that Kramer's date last insured was December 31, 2013. (Doc. 13-3, at 17, 19; Doc. 13-6, at 2, 40).

"must support his or her contentions with objective medical evidence." *Sassone v. Comm'r of Soc. Sec.,* 165 F. App'x 954, 958 (3d Cir. 2006). No "symptom or combination of symptoms can be the basis for a finding of disability" before the during the insured period "unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment." *Perez v. Comm'r of Soc. Sec.*, 521 F. App'x 51, 55 (3d Cir. 2013) (quoting SSR 96–4p, 1996 WL 374187, at *1 (July 2, 1996)) (internal quotation marks omitted). There must also be "evidence that the condition significantly limited his ability to do basic work activities during the insured period." *Kirkland v. Colvin*, No. CIV.A. 14-224, 2015 WL 5732178, at *1 (W.D. Pa. Sept. 30, 2015) (quoting *Perez,* 521 F. App'x at 55).

The question is whether there is substantial evidence to support the ALJ's determination that Kramer failed to provide objective medical evidence demonstrating that his depression is (1) a medically determinable impairment; and (2) that significantly limited his mental ability to do basic work activities before his date last insured of December 31, 2013. In evaluating this contention, the Court is mindful that the "burden on a claimant ... is *de minimis* and at this stage, an applicant need only demonstrate something beyond a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *Perez,* 521 F. App'x at 55 (internal quotation marks omitted). The Commissioner's "determination to deny an applicant's request for benefits at step two should [therefore] be reviewed with close scrutiny," although the determination is "to be upheld if supported by substantial evidence on the record as a whole." *McCrea v. Comm'r of Soc. Sec.,* 370 F.3d 357, 360 (3d Cir. 2004) (internal quotation marks omitted).

- 27 -

Kramer argues that the ALJ's conclusion that his depression was non-severe prior to his date last insure "is based largely upon an outright mistake of fact that renders her analysis fatally flawed." (Doc. 19, at 14). Kramer points to the ALJ's notation that "there are no further records from Mr. Loeb until [Kramer] returned in May of 2016," and argues that there are medical records from April 1, 2014 and June 23, 2106 indicating Kramer's treatment for depression. (Doc. 13-8, at 9; Doc. 19, at 14-15). At the outset, the Court notes that the ALJ found Kramer's depression non-severe from his alleged onset date to the date last insured. (Doc. 13-8, at 9). Thus, the Court examines whether Kramer has presented sufficient evidence regarding his depression before December 31, 2013. (Doc. 13-3, at 17). Although Kramer points to evidence of treatment in 2015 that the ALJ did not mention in his evaluation of Kramer's depression prior to the date last insured, such evidence is from after the date last insured. (Doc. 13-7, at 477-487; Doc. 13-8, at 9). The ALJ noted that Kramer received counseling in 2014, however, this was after the date last insured. (Doc. 13-7, at 135; Doc. 13-8, at 9). Further, the ALJ went on to discuss Kramer's daily activities during the relevant time period and medical opinions indicating mild limitations. (Doc. 13-2, at 138, 140, 155, 159-60 163-66; Doc. 13-3, at 6-7, 17-18; Doc. 13-6, at 18-22; Doc. 13-8, at 9). Thus, the ALJ's finding that Kramer's depression was non-severe prior to his date last insured is supported by substantial evidence. (Doc. 13-8, at 9).

Even if the ALJ had erred at step two in finding that Kramer's depression was non-severe before his date last insured, any error was harmless. If an ALJ finds one or more impairments to have been severe and continues to the remaining steps of the sequential analysis, the ALJ's "erroneous determination of an impairment's non-severity may constitute harmless error, provided that the impairment continues to be factored in." *Rodriguez v.*

*Berryhill*, No. CV 17-6884-KM, 2019 WL 1013343, at *9 (D.N.J. Mar. 1, 2019) (emphasis added); *see also* Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 (3d Cir. 2007) ("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless."); *Rutherford v. Barnhart, 399 F.3d 546, 552–53 (3d Cir. 2005)* (failing to determine the severity of a condition at stage two was harmless because the ALJ properly considered it in the evaluation of the claimant's limitations). Here, the ALJ adequately considered Kramer's depression in evaluating his limitations before his date last insured, as discussed *supra*, and any error was therefore harmless.

Second, Kramer contends that the change in the severity of his mental limitations is not reflected in the ALJ's subsequent RFC finding. (Doc. 19, at 15). The ALJ found that since January 1, 2014, Kramer had a severe impairment of major depressive disorder, dysthymic disorder, and bipolar disorder. (Doc. 13-8, at 8). In the ALJ's RFC finding since January 1, 2014, the ALJ added the following mental limitations: "[Kramer] is limited to unskilled work activity as defined in the Dictionary of Occupational Titles that is low stress, defined as only occasional decision making required and only occasional changes in the work setting." (Doc. 13-8, at 15). Thus, Kramer's argument is inaccurate as the ALJ reflected a change in mental impairments between her two RFC determinations upon finding that Kramer possessed severe mental impairments. (Doc. 13-8, at 14-15).

The ALJ's mental limitations reflected in the RFC findings since January 1, 2014, are supported by substantial evidence. The ALJ considered Kramer's testimony, daily activities, treatment history, and the medical opinions that were provided regarding his mental impairments. (Doc. 13-8, at 13-14). The ALJ found that Kramer has "a mild limitation in

- 29 -

understanding, remembering, or applying information, a mild limitation in interacting with others, a moderate limitation in concentrating, persisting, or maintaining pace, and a mild limitation in adapting or managing oneself." (Doc. 13-8, at 13-14). The ALJ considered Kramer's answers to his function reports indicating difficulty in various areas of mental functioning; his daily activities including his ability to care for himself and function in daily life; treatment notes involving mental evaluations; and medical opinions indicating no more than moderate limitations in concentrating, persisting, or maintaining pace. (Doc. 13-6, at 17, 19, 22; Doc. 13-7, at 354, 449; Doc. 13-8, at 14, 61-63; Doc. 13-9, at 36-37, 89-91; Doc. 13-12, at 31-37; Doc. 13-13, at 4, 21-22, 39, 202, 577, 602; Doc. 13-14, at 557, 560, 573). Further, the ALJ considered Kramer's complaints regarding his mental impairments, but found that "objective findings on mental status examinations are within the mild to moderate range, with many findings noted consistently as unremarkable" and additionally considered multiple treatment notes supporting such findings. (Doc. 13-7, at 354, 371, 379, 398, 449, 516; Doc. 13-8, at 20; Doc. 13-13, at 4, 21-22, 39, 202, 510, 574, 577, 602, 606; Doc. 13-14, at 557, 560-61, 565, 569, 573, 881). The ALJ also noted the type of treatment Kramer received stating that "there is no evidence that the claimant required, or was referred for any group therapy, partial hospitalization program, inpatient hospitalization, or other form of intensive mental health intervention during the relevant time." (Doc. 13-8, at 20).

Thus, substantial evidence supports the ALJ's evaluation of Kramer's mental impairments and their reflection in both RFC determinations. (Doc. 13-8, at 14-15).

V.    **CONCLUSION**

Based on the foregoing, the Court **AFFIRMS** the Commissioner's decision to deny Kramer disability benefits and directs that **FINAL JUDGMENT BE ENTERED** in favor of the Commissioner and against Kramer. The Clerk of Court is directed to **CLOSE** this case.

An appropriate Order follows.

**BY THE COURT:**

Dated: **August 29, 2022**          *s/ Karoline Mehalchick*
                                   **KAROLINE MEHALCHICK**
                                   **Chief United States Magistrate Judge**